## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WORLD DEPOT CORPORATION,<br>    *Plaintiff,*<br><br>v.<br><br>LORENZO ONOFRI,<br>STILE SOCIETA COOPERATIVA d/b/a<br>STILE,<br>TIBERINA LEGNAMI S.P.A.,<br>PATRIZIO CAPONERI,<br>ROBERTO BELLI, and<br>FEDERICO BIAGIOLI<br>    *Defendants* | Civil Action No: 1:16-cv-12439<br><br>JURY DEMAND |

## COMPLAINT AND JURY TRIAL DEMAND

## INTRODUCTION

The plaintiff, World Depot Corporation ("World Depot"), is the exclusive North America factory representative for the Anbo-Stile wood flooring factory in Italy. As such, World Depot served as the conduit between all United States customers and the factory. The defendants – a former owner of the factory, Lorenzo Onofri, and his confederates including Stile Societa Cooperativa d/b/a Stile, Tiberina Legnami S.P.A., Roberto Belli, Patrizio Caponeri, and Federico Biagioli – illegally wrested control of the Italian factory from its current owners, and usurped World Depot's business in North America. Specifically, these defendants diverted sales and accounts away from World Depot, accessed Anbo-Stile's bank account, and instructed World Depot's customers to wire payment directly to the defendants instead of to World Depot. Stated differently, the defendants conspired to shut World Depot off from its continuing business relationships in Massachusetts, throughout North America, and in Italy; this constitutes a distinct

enterprise which, through a pattern of racketeering, proximately caused injury to World Depot. The defendants are therefore liable to World Depot under the Racketeer Influenced and Corrupt Organizations Act. In addition, they are liable to World Depot for various business torts and violations of M.G.L. ch. 93A.

<u>PARTIES</u>

1.      Plaintiff World Depot Corporation is a Massachusetts corporation with its places of business located at 1 Nichols Lane Ext., Lynnfield, MA 01940 and 47 Newbury St. Peabody, MA 01960.

2.      Defendant Lorenzo Onofri is an individual resident and a citizen of Italy residing at Via Bracco 29, 06012 Citta' di Castello, Italy.

3.      Defendant Stile Societa Coopertiva is an Italian business with a principal place of business at Via dei Laghi 18, 06018 Bivio Lugnano – Trestina, Citta' di Castello (PG), Italy. Stile Societa Coopertiva's legal address is Via Bracco 29, 06012 Citta' di Castello (PG), Italy.

4.      Defendant Tiberina Legnami, S.P.A. is an Italian business with a principal place of business at Via dei Laghi 18 – 06018 Bivo Lugnano – Trestina – Citta' di Castello (PG), Italy.

5.      Defendant Roberto Belli is an individual resident and citizen of Italy engaging in business at Via dei Laghi 18 – 06018 Bivo Lugnano – Trestina – Citta' di Castello (PG), Italy.

6.      Defendant Patrizio Caponeri is an individual resident and citizen of Italy engaging in business at Via dei Laghi 18 – 06018 Bivo Lugnano – Trestina – Citta' di Castello (PG), Italy.

7.      Defendant Federico Biagioli is an individual and resident of Italy residing at Via R. D'andreotto 5 A – 060124 Perugia, Italy.

<u>JURISDICTION AND VENUE</u>

8.      Original subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States, and pursuant to 18 U.S.C. §

1964(b), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). This Court has supplemental jurisdiction over other claims under 28 U.S.C. § 1367. In addition, because this claim is between citizens of this Commonwealth and citizens of a foreign state and the amount in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2).

9.      Venue is proper in this Court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 and because one or more of the Defendants conducted business in the district, including selling goods and providing services. In addition, a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce has been carried out in this district.

## FACTS COMMON TO ALL COUNTS

### A.  Anbo-Stile's Relationship with Lorenzo Onofri

10.      Stile Pavimenti Legno, S.p.a. ("Stile") was a high end wood flooring manufacturer located in Citta di Castello, Italy. In and around late 2013, Stile was experiencing significant financial difficulties as a result of bad investments and the significant downturn of the Italian market.

11.      Lorenzo Onofri was the President, Chief Executive Officer, and owner of Stile. In or around late 2013, Onofri told an individual named Corey Lewis who was a customer of Stile, that he was seeking a potential buyer of his manufacturing facility. After giving the acquisition of Stile some though, Lewis agreed to purchase the debt and assets of the business with a business partner.

12.      Following the completion of Lewis and his business partner's acquisition of the Stile Factory in early 2014, they formed an Italian entity named Anbo-Stile ("Anbo").

13.     In and around April 2014, Anbo entered into a lease purchase agreement with Stile confirming the acquisition of the Stile manufacturing facility. As a result of the arrangement between buyers (who were principally English speakers) and the sellers (who were principally Italian speakers), the lease purchase agreement was drafted in both English and Italian. A notary public, Marco Fanfani, was hired with the intent of confirming that the lease purchase agreement accurately reflected the parties' intent in both languages. However, Fanfani did not tell the buyers about substantial differences between the English version and the Italian version of the lease purchase agreement.

14.     The lease purchase agreement consisted of four stand-alone contracts which, as a whole, made up the entirety of the agreement. The four contracts involved: 1) the lease of the business, 2) the purchase of the business, 3) the purchase of inventory belonging to Stile for a four year term of the lease agreement and 4) the ability to purchase of inventory belonging to Stile by Anbo at the end of the lease term. The lease purchase agreement is attached as Exhibit 1.

15.     In or around 2014, as a result of entering into bankruptcy protection in the Court of Perugia, the previously existing Stile entity took on the name "Tiberina Legnami" ("Tiberina"). Roberto Belli and Patrizio Caponeri were the liquidators in charge of winding up Tiberina's business (the "Liquidators").

16.     Over the first two years of its existence, Anbo operated successfully. Upon information and belief, in 2015, Anbo's revenue grew to 8.3 million euros.

17.     As of June 2016, Anbo had pending orders to be filled over the next ten months totaling twenty million euros. These orders were comprised of Anbo's core business of approximately eight to ten million euros and the business World Depot brought Anbo totaling approximately ten to twelve million euros.

### B.  World Depot's Relationship with Anbo-Stile

18.      World Depot, established in 2008, is a company offering cabinetry and flooring products and installation to commercial, wholesale and retail clients and that operates five showrooms, including in Peabody and Boston. It offers a variety of cabinetry and flooring products including hardwood, tile, and carpeting, as well as design and installation services.

19.      World Depot was founded by its sole stockholder, Peter Alfe. Through nearly a decade of hard work as a full-time owner and operator, Alfe built World Depot into a successful and growing cabinetry and flooring business with five showrooms and three facilities overall, opening first in Peabody, then in Maine, and subsequently in Boston, which opened just recently in 2013. Because of Alfe's efforts to build the business of World Depot over nearly a decade, World Depot acquired significant good will amongst consumers of cabinetry and flooring products and services throughout North America.

20.      By August 2015, Anbo and World Depot were discussing the possibility of World Depot acting as Anbo's exclusive factory representative agent in the North American market. Beginning in August of 2015 World Depot increased its operational capacity and built exclusive Anbo showrooms in order to demonstrate its ability to generate business and commitment to Anbo products World Depot.

21.      By December of 2015, World Depot was Anbo's second or third largest account. By late February or early March of 2016, Anbo and World Depot made an oral agreement that World Depot would become Anbo's exclusive factory representative agent for the North American market. To Anbo, the exclusivity agreement represented a more secure supply chain and a footprint in the United States. For World Depot, it represented an alliance that would help

bolster its client base and would demonstrate its commitment to providing high-end wood flooring.

22.     By way of its agreement with Anbo, World Depot sold Anbo flooring at agreed prices to United States consumers, contractors, and wholesalers. World Depot earned a reasonable markup on each sale because it acquired the flooring from Anbo for less than it resold the flooring. As the exclusive representative of Anbo, World Depot became the factory representative, and was entitled to earn its markup, for all of the work which was currently pending with Anbo in North America as of August 2015.

23.     World Depot spent a substantial amount of money, time, and expense to develop its business to become the exclusive North American factory representative for Anbo's flooring products. World Depot also incurred considerable expense to maintain its exclusive relationship with Anbo.

24.     Since becoming its exclusive agent, World Depot has brought in new sales accounts for Anbo and has successfully serviced and maintained its growing business in its exclusive territory.

25.     World Depot has registered to do business as "Stile" in Peabody, Massachusetts.

**C.  Onofri's work with Anbo-Stile.**

26.     Following the acquisition of Stile, Anbo's ownership hired Onofri, the former CEO of Stile, as its General Sales Manager.

27.     On information and belief, Onofri orchestrated and took this position in order to profit from the sale of Stile and then steal the factory back from Anbo.

28.     Over time, Onofri became difficult to work and failed to satisfy his job requirements for Anbo.

29.     On or about July 2014, Lewis confronted Onofri concerning his lack of ability to do the job of a General Sales Manager and warned Onofri that his job was in jeopardy if his performance did not improve.

30.     Soon following that conversation, and for the next several months, Onofri strategically attempted to divide Lewis and his business partner.

31.     In 2014 after Anbo agreed to purchase the business and entered the factory, it realized the inventory was in disarray. The facility includes two separate warehouses, one fully automated and the other a traditional warehouse. The inventory in both warehouses is comprised of pallets of material and is tracked via computer software. Each pallet is assigned a barcode which is affixed to the pallet. When an employee would remove an amount of material, he would scan the barcode and indicate how much material was removed.

32.     The warehouses contained both Anbo's inventory that it purchased from Tiberina as well as inventory Tiberina retained. Anbo had an exclusive option to purchase Tiberina's inventory for one year after the purchase of the business. After the expiration of the option period, Tiberina was free to sell the inventory to third parties.

33.     The inventory software, which tracked both Anbo's inventory and Tiberina's retained inventory, was configured in such a way that Tiberina's inventory could not be added to the system, but only removed. This feature proved problematic because many of Tiberina's pallets were missing barcodes. The software also did not allow duplicate labels to be printed, and when new labels were printed, they could not be included in Tiberina's inventory. Simply in order to attempt to maintain proper labeling in the warehouse, Anbo was forced to put these pallets into the software as part of its inventory, even though Anbo never intended to use the materials. This caused the software to generate invoices payable by Anbo to Tiberina, despite

7

Anbo never desiring to purchase the materials. The software was also configured so that any time Anbo used the automated warehouse to move Tiberina pallets, the software would treat those pallets as purchased, regardless of Anbo's motive for moving the pallets. Anbo was subsequently accused of not paying for these materials even though Anbo neither used nor intended to purchase them. Prior to entering into the lease agreement, Anbo was not aware that invoices would be generated each time a product was moved, even if it was not purchased.

34.     Upon information and belief, Onofri successfully strained the relationship between Lewis and his business partner. Eventually, Onofri and Lewis's business partner developed a high level of trust with each other, and began to shut Lewis out.

**D.  Onofri arranges the Cooperativa.**

35.     During a meeting on or around February 28, 2016, Onofri contacted several key employees of the Anbo manufacturing facility including union representatives. At that meeting, Onofri stated that he wanted to retake the factory from the owners by way of a cooperative. Under Italian law, a cooperative, or in Italian, Cooperativa, is created when an organization is formed consisting of and owned by employees. At a dinner on February 29, 2016, Onofri obtained the support of Defendant Federico Biagioli, who proclaimed he would support all efforts of Onofri to retake the factory

36.     Through his union connections and the support of Mr. Biagioli, Onofri secured the support of a number of key employees. Before Onofri's scheme, there were 42 employees at the factory. Afterwards, only 22 remained. Seven of these employees were loyal to Onofri while the others simply could not afford to be without a job.

37.     Critically, Onofri also secured the support of the Liquidators who controlled Tiberina, formerly known as "Stile Pavimenti Legno S.p.a," from which Anbo bought the factory and to which it still owed a debt under the lease-purchase agreement.

38.     While Onofri was laying the groundwork to take over the factory from Anbo, he and Enriquo Galoppini provided Anbo's principals misinformation concerning its rent obligations and inventory obligations. Galoppini was Anbo's connection to the Liquidators, but was also connected to Onofri.

39.     On or about May 23, 2016, Tiberina ultimately informed Anbo that it owed Tiberina over one million euros for inventory and back rent. Anbo disputed the inventory amount because, as detailed above, it had not actually purchased or used the alleged inventory. Anbo immediately paid the alleged unpaid rent.

40.     In addition, as part of his plan to retake control and ownership of the factory from Anbo, Onofri took other steps to undercut Anbo's profitability and status in the market place. Among other things, Onofri specifically:

a.   sent an email on Anbo letterhead to all agents and customers negatively describing Anbo's owners and stating that he was going to form a Coperativa to take ownership and control of the factory;

b.   contacted Anbo suppliers and instructed them not to deliver raw materials to Anbo and instructed the suppliers to stop cooperating with Anbo;

c.   encouraged and coordinated key factory employees to slow down production, which caused deliveries to be delayed; and

d.   used his union connections, including Mr. Biagioli to arrange a union meeting to seed unrest about factory performance and to encourage a strike.

41.     Through these actions, Onofri undercut Anbo's support from its employees, created turmoil between Tiberina and Anbo, and formed the Stile Societa Cooperativa ("Cooperativa") in order to take ownership of the factory.

42.     In fact, on or about June 24, 2016, Onofri established the Cooperativa as an entity comprised of employees of the factory, with the authority to act as a legal entity under Italian law. Onofri held the position of President in the Cooperativa and at all times was the individual with ultimate control over the Cooperativa.

**E.  June 2016 Worker Strike**

43.     Largely due to the unrest created by Onofri, in or about early June 2016, workers at the Anbo manufacturing facility went on strike.

44.     Two weeks later, on or about June 20, 2016, Tiberina, at the direction of the Liquidators, took the factory, locking out Anbo management including Lewis. The key personnel loyal to Onofri continued to work at the factory for Tiberina from June 20, 2016 to the date the Cooperativa negotiated a contract with the liquidator.

45.     When Tiberina took the factory, it inherited all the factory employees. Ten days later, it fired all the employees except nine. These nine employees were shipping Anbo's goods to customers without Anbo's permission to create the appearance of stability at the factory and ensure a smooth transition to the Cooperativa.

46.     The Cooperativa refused to ship any product to World Depot following the takeover of the company. The Cooperativa had taken over all pending orders and caused drastic interference with ongoing orders scheduled to be sent to World Depot.

47.     Shortly after June 20, 2016, Anbo learned that Tiberina planned to enter into an agreement with the Cooperativa under which the Cooperativa, and not Anbo, would ultimately take ownership of the factory.

48.     The June 2016 strike and subsequent takeover orchestrated by Defendants have caused numerous negative effects on World Depot including the loss of accounts and an inability to fulfill purchase orders.

49.     Anbo management was unable to visit the manufacturing facility until on or about July 29, 2016. At this time, it was realized that a large volume of Anbo inventory was missing. In addition, a large volume of Anbo's inventory was kept in an area of the manufacturing facility that caused damage to the flooring product.

50.     This destruction of property impacted World Depot's ability to continue to service their clients in North America and as a result of the conspiring acts against Anbo, World Depot suffered significant damages.

**F.  Tiberina and the Liquidators aided and abetted the illegal takeover by Onofri and caused irreparable harm to Anbo and World Depot.**

51.     Tiberina also played a critical role in the takeover by the Cooperativa.

52.     Following the illegal takeover by Onofri and the Cooperativa, Tiberina terminated the employment of all Anbo workers. Tiberina, at the direction of the Liquidators, also issued a communication to all of Anbo's present customers and suppliers stating that the contract had been terminated and blocked Anbo's access to its emails.

53.     Tiberina, then, entered into an agreement with the Cooperativa to run the factory in direct contravention of its lease-purchase agreement with Anbo. Tiberina gave the Cooperativa access to Anbo's order book and all of Anbo's work in progress. As a result, the

Cooperativa immediately requested that pending customers, including those in North America, reissue purchase orders under the name of the Cooperativa.

54.     On or about July 5, 2016, Tiberina entered into an agreement with the Cooperativa leasing the factory for less than a third of the fee Anbo paid. This demonstrates that Tiberina's principal goal was to support the actions of Onofri and the Cooperativa.

55.     Tiberina refused to allow Anbo to deliver furnished goods to customers yet allowed the Cooperativa to deliver goods belonging to Anbo's customers without the approval of Anbo.

56.     As a result of Tiberina's aiding and abetting, the Cooperativa was enabled to take over the accounts of World Depot and cause subsequent destruction of World Depot's business relationships.

## G.  Post-takeover actions

57.     Since Anbo lost control of the manufacturing facility and its inventory on or about June 20, 2016, Tiberina and the Cooperativa have continued to take action against Anbo. These actions have continued to affect World Depot's ability to do business.

58.     In particular, Tiberina and the Cooperativa have made it impossible for Anbo to transport its own inventory from the factory and stolen the entirety of Anbo's order book consisting of orders in the amount of 2.6 million euros.

59.     Anbo has a bank account for its business with Banca Carim ("Carim Bank").

60.     Since the date of the strike on June 20, 2016, Anbo has not accessed its online bank account. Anbo has also not changed the password or security information to its online bank account.

61.     Anbo recently discovered that the Cooperativa and/or Tiberina used an IP address labeled "Stile Pavemneti Legno SPA" to access the online bank account eleven times between July 11, 2016 and August 25, 2016.

**H.  World Depot's Loss of Accounts**

62.     As a direct result of the June 2016 strike and subsequent takeover by the Cooperativa, World Depot has lost significant business relationships and contacts. Because of delays caused by the takeover of the manufacturing facility, World Depot was unable to meet the demands of various customers.

63.     On June 22, 2016, approximately two days following the strike at the Anbo manufacturing facility, World Depot received a letter from representatives of one of World Depot and Anbo's largest customers. The customer, Nature Flooring Industries, Inc., cancelled the second of two phases of a contract worth over two million dollars. The letter directly cited the reason for its cancellation as "non-performance and non-delivery." See Letter from McCollom Counsel attached as Exhibit 2. The delays and delivery problems referenced in the letter were caused by Onofri's and Tiberina's slowdown in business and undermining of Anbo prior to the hostile takeover and lockout.

64.     On July 1, 2016, just over one week following the strike at the Anbo manufacturing facility, World Depot also received e-mail correspondence from another World Depot and Anbo customer, Seville, cancelling their purchase of Stile flooring due to the factory takeover. The project was worth over five hundred thousand dollars.

65.     Not only did Onofri and the Cooperativa's action cause World Depot to lose these accounts, but it also cost World Depot future business with the customers, causing substantial future losses.

66.     Because of the damage to its reputation, World Depot also lost significant good will.

67.     The Cooperativa has also shipped product to some of World Depot's customers directly, cutting out World Depot from the supply chain. The Cooperativa has also demanded payment directly from these customers.

68.     Certain of these present customers of World Depot have expressed to World Depot that the flooring they are now receiving is not the same quality as they previously received when the factory was in Anbo's possession, further undermining World Depot's relationships with its clients.

69.     World Depot has customers who have purchased or have expressed an interest in purchasing Anbo products throughout the United States, including in California, New York, Washington D.C., Rhode Island, Florida, Illinois, Washington, and Massachusetts. The Defendants' wrongful actions have therefore had a far-reaching impact on United States commerce.

70.     As such, because of the conspiring activities of all Defendants involved, World Depot has lost significant both present and future business and suffered irreparable harm.

**I.   Stile Societa Cooperativa's Interaction with Allegheny (Predicate Act #1)**

71.     Allegheny Contract ("Allegheny") is a United States-based customer of Anbo and World Depot. Following the takeover, World Depot issued a purchase order to Anbo to supply product to Allegheny. The Cooperativa intercepted this purchase order and emailed an invoice requesting money to be paid directly to the Cooperativa.

72.     Allegheny also received e-mail correspondence from the Cooperativa's accounting department. In this e-mail correspondence, the Cooperativa directed all payments to be wired to the Cooperativa so as to avoid payment to Anbo and/or World Depot.

73.     Shortly after this e-mail was sent on July 12, 2016, Allegheny wired money to the Cooperativa as per the Cooperativa's instruction. Between July 22, 2016 and July 27, 2016, Allegheny wired three transfers totaling $6,391.67 to the Cooperativa.

74.     Onofri has also informed Allegheny that Anbo and World Depot would be unable to meet their current demands for flooring product.

75.     Because of these communications with Allegheny, Onofri and the Cooperativa have attempted to divert all of Allegheny's flooring business towards the Cooperativa. As a result, Onofri and the Cooperativa conspired to directly interfere with and destroy World Depot's business relationship with Allegheny.

76.     The email communications are fraudulent and were transmitted by wire and therefore violate 18 U.S.C. § 1343.

77.     Allegheny was expected to order over five million dollars of high-end flooring from World Depot and, in turn, Anbo. Upon information and belief, this business has been diverted to Stile Societa Cooperativa and the predicate act is therefore ongoing and continuous.

78.     Because of the Defendants' acts, World Depot has suffered and will continue to suffer significant economic damages.

## J.  Stile Societa Cooperativa's Letter to World Depot Customers (Predicate Act #2)

79.     On July 12, 2016, and after the takeover of the Stile factory and the formation of the Cooperativa, Mr. Onofri on behalf of Stile Societa Cooperativa, sent letters to World Depot's customers, a copy of which is attached hereto as Exhibit 3, informing them that "the Stile

partnership with Anbo is over." The letter further stated that "every customer who wants to purchase a 'Stile' branded product must contact and place orders to [Stile Societa Cooperativa]."

80.     The letter also included information regarding "a new bank account" which purports to belong to Stile Societa Cooperativa.

81.     Upon information and belief, this letter was sent to all of World Depot's customers. At a minimum, the letter was sent to Allegheny (based in Massachusetts) and Rouse Company (based in California), a prospective customer of World Depot that was interested in purchasing Anbo products.

82.     Upon information and belief, Mr. Onofri, on behalf of Stile Societa Cooperativa, sent this letter to World Depot's customers in a direct attempt to solicit their business in contravention of World Depot's exclusivity agreement with Stile and to in effect, steal World Depot's customers.

83.     Upon information and belief, World Depot's customers have made orders directly to Stile Societa Cooperativa, and have paid monies pursuant to those orders directly to Stile Societa Cooperativa's bank account referenced in the letter. Any orders these customers might make in the future will also be diverted, and therefore this predicate act is ongoing and continuous.

84.     The letter is fraudulent and was transmitted via email and therefore violates 18 U.S.C. § 1343.

85.     By reason of the Defendants' acts, World Depot has suffered and will continue to suffer significant economic damages.

## K.  Italian Court Proceedings

86.     On or about July 8, 2016, the Court of Perugia, Italy granted Anbo an injunction to stop Tiberina from entering into an agreement with any third party to transfer control or ownership of the factory and from naming the Cooperativa as a party to any contract. Following the court's injunction award, Anbo served Tiberina with the injunction but Tiberina failed to comply.

87.     Anbo and Tiberina held a hearing to enforce the injunction previously obtained by Anbo on August 25, 2016.

88.     On October 11, 2016, following a subsequent September hearing, the judge issued a decision that the temporary injunction would be upheld in Anbo's favor. A translation of that decision is attached as Exhibit 4.

### COUNT I – Violations of 18 U.S.C. 1962(c) (RICO) – All Defendants

89.     Mr. Onofri, Stile Societa Cooperativa, Tiberina, the Liquidators and Mr. Biagioli have violated 18 U.S.C. §§ 1962(c) and 1962(d).

90.     Mr. Onofri, Stile Societa Cooperativa, Tiberina, the Liquidators and Mr. Biagioli (the "Enterprise") have formed an association-in-fact between themselves constituting an enterprise

91.     The Enterprise's racketeering activities have had a direct, substantial, and reasonably foreseeable effect on United States commerce, and intended to cause, and did in fact cause harm to United States commerce.

92.     Because the Liquidators used Tiberina to perpetrate and promote fraud, they are personally liable for Tiberina's misdeeds.

93.     The Enterprise's activities affected United States commerce because World Depot is the exclusive North American representative for Anbo and represented the only way North American customers could obtain Stile products.

94.     The Enterprise has the common purpose of marketing and selling Stile brand products but also usurping control of the Anbo Factory in order to steal World Depot's customers.

95.     the members of the Enterprise are related to one another in that Tiberina, at the direction of the Liquidators leases the factory to the Cooperativa operated by Mr. Onofri. Mr. Biagioli has supported the efforts of the Enterprise and used his union connections to further the takeover of the factory.

96.     Upon information and belief the Enterprise has existed for several years before it set its scheme into motion. In the letter to World Depot's customers, Mr. Onofri, on behalf of the Enterprise, indicated that Stile Societa Cooperativa was formed to "complete the relaunch process that started a couple of years ago."

97.     Upon information and belief the Enterprise have conspired to injure and destroy World Depot's business and to damage World Depot's reputation with its customers.

98.     Upon information and belief, and as further detailed above, the Enterprise has engaged in and/or conspired to commit two or more predicate acts in furtherance of this scheme thereby establishing a pattern of racketeering activity.

99.     The predicate acts the Enterprise engaged in were accomplished through mail and wire fraud, are ongoing in nature, and were targeted at World Depot.

100.   Upon information and belief, these acts were made in conjunction with a concerted effort to steal World Depot's present customers and to accrue future business from these customers.

101.   Upon information and belief, the acts were intentionally undertaken for the purpose of harming World Depot, World Depot's business, and World Depot's prospective customer relationships by means that were illegal, unfair and improper.

102.   By reason of the Enterprise's pattern of racketeering activities, World Depot has lost current and future customers, suffered significant injury to its reputation and has suffered and will continue to suffer significant financial injury to its business.

## COUNT II – Violations of 18 U.S.C. 1962(d) (RICO) – All Defendants

103.   The Enterprise has conspired to violate 18 U.S.C. § 1962(c) and have therefore violated 18 U.S.C. 1962(d).

104.   The object of the conspiracy was to participate in, both directly and indirectly, the racketeering conduct of the Enterprise described above.

105.   As detailed above, the Enterprise has engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy.

106.   Upon information and belief, these acts were perpetrated through mail and wire fraud and are continuous and ongoing in nature.

107.   As a direct and proximate result of the Enterprise's overt and predicate acts in furtherance of violating 18 U.S.C. 1962(d) by conspiring to violate 18 U.S.C. 1962(c), World Depot has been and continues to be injured in its business as set forth more fully above.

## COUNT III – Tortious Interference with Contractual Relations – All Defendants

108.   World Depot, as the exclusive North American representative for Anbo, has numerous contracts with customers requesting flooring product from the Anbo factory.

19

109.    The Enterprise knew both that World Depot was the exclusive North American representative for Anbo and that World Depot had contracts with its customers for flooring product from the Anbo factory.

110.    The Enterprise knowingly and intentionally induced World Depot's customers to breach their contracts with World Depot.

111.    The Enterprise's motives were improper in that their goal was to steal World Depot's customers for their own financial gain.

112.    World Depot has suffered and continues to suffer significant financial harm as a result of the Enterprise's actions.

## COUNT IV – Tortious Interference with Advantageous Business Relations – All Defendants

113.    World Depot, as the exclusive North American representative for Anbo, has business relationships with Anbo and its customers.

114.    The Enterprise knew that World Depot was the exclusive North American representative for Anbo and that World Depot had developed customers interested in purchasing product from the Anbo factory.

115.    The Enterprise knowingly and intentionally interfered with World Depot's business relationships by stealing World Depot's current customers and by rendering World Depot's role as exclusive North American representative for Anbo irrelevant by failing to honor the exclusivity agreement.

116.    The Enterprise's motives were improper in that their goal was to steal World Depot's customers for their own financial gain.

117.    World Depot has suffered and continues to suffer significant financial harm as a result of the Enterprise's actions.

**COUNT V – Tortious Interference with Prospective Business Relations – All Defendants**

118.     The Enterprise knew that World Depot was the exclusive North American representative for Anbo and that World Depot was working and expending significant time and money developing customers interested in purchasing product from the Anbo factory.

119.     As a direct result of the wrongful acts further described above, the Enterprise has intentionally stolen or otherwise interfered with World Depot's prospective customers for their own financial gain.

120.     World Depot has suffered and continues to suffer significant financial harm as a result of the Enterprise's actions.

**COUNT VI – Violation of G.L. c.93A – All Defendants**

121.     By the conduct set forth above, the Enterprise has engaged in unfair and deceptive acts or practices in violation of G.L. c. 93A, § 2.

122.     As alleged above, the unfair and deceptive practices occurred in commerce in Massachusetts.

123.     The unfair and deceptive acts which have been committed by the Enterprise were committed knowingly and willfully, and under such circumstances that the Enterprise is liable for multiple damages as well as legal fees and the costs of this litigation.

124.     As a direct and proximate result of the Enterprise's acts, World Depot has suffered and continues to suffer significant financial harm.

**Demand For Relief**

World Depot respectfully requests that this Court:

1.     Enter judgment in favor of World Depot on all Counts stated in the Complaint including a judgment that the Defendants have violated 18 U.S.C. 1962(c-d) and G.L. c. 93A § 2;

2.      Awarding World Depot damages in an amount to be determined at trial but in no event less than $10,000,000.00, plus pre-judgment interest from the commencement of the Defendant's tortious and criminal activities;

3.      Award World Depot treble damages, attorneys' fees, and costs pursuant to 18 U.S.C. § 1964 and G.L. c. 93A § 11;

4.      Enter an order preliminarily and permanently enjoining the Defendants from contracting with World Depot's customers or issuing statements to World Depot's customers regarding World Depot's business;

5.      For such other and further relief as the Court may deem just and proper under the instant circumstances.

### Jury Demand

The plaintiffs demand a trial by jury on all counts so triable.

WORLD DEPOT CORPORATION
By its attorneys,

Dated: December 1, 2016

/s/ Joshua M. D. Segal
J. Mark Dickison (BBO No. 629170)
    MDickison@Lawson-Weitzen.com
Joshua M. D. Segal (BBO No. 678367)
    JSegal@Lawson-Weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, Massachusetts 02210
(617) 439-4990
(617) 439-3987 (fax)