―――――――――――――――――――――――――――――――――

|  |  |
|---|---|
| WORLD DEPOT CORPORATION, | ) |
| | ) |
| **Plaintiff,** | ) |
| | )      **Civil Action No.** |
| v. | )      **16-12439-FDS** |
| | ) |
| LORENZO ONOFRI; | ) |
| STILE SOCIETA COOPERATIVA | ) |
| d/b/a STILE; TIBERINA LEGNAMI S.P.A.; | ) |
| PATRIZIO CAPONERI; ROBERTO | ) |
| BELLI; and FEDERICO BIAGIOLI, | ) |
| | ) |
| **Defendants.** | ) |

―――――――――――――――――――――――――――――――――

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This action arises out of an alleged takeover of an Italian company that manufactures wood flooring. Plaintiff World Depot Corporation is a Massachusetts distributor of cabinetry and flooring products. In substance, it complains that the new owners of the Italian company engaged in various types of wrongful conduct, injuring it in its business.

According to the complaint, an Italian entity called Anbo owned a factory in Citta di Castello, Italy, that manufactures wood flooring. Anbo and World Depot allegedly had an oral agreement under which World Depot would serve as Anbo's exclusive North America factory representative. The complaint alleges that Lorenzo Onofri and his confederates masterminded a takeover of the factory from its rightful owners, creating a new entity called Stile Societa Cooperativa. The events culminating in the takeover disrupted Anbo's production lines and shipping arrangements, allegedly causing World Depot financial losses. The complaint further

alleges that Onofri and the Cooperativa interfered with the exclusive distribution rights of World Depot by selling directly to World Depot's customers.

Notably, the complaint does not allege breach of the oral agreement between World Depot and Anbo, or any other form of contract. Nor does it contend that the Cooperativa is the legal successor to the obligations of Anbo. Instead, World Depot asserts claims under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-68), as well as claims under state law for tortious interference with contractual relations, tortious interference with advantageous business relations, tortious interference with prospective business relations, and violation of Mass. Gen. Laws ch. 93A.

Defendants have moved to dismiss the complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the motion will be granted.

## I.  Background

### A.  Factual Background

The facts are set forth as alleged in the complaint.

#### 1.  Stile's Sale to Anbo

Lorenzo Onofri is a citizen of Italy. (Compl. ¶ 2). As of 2013, he was the President, Chief Executive Officer, and owner of Stile Pavimenti Legno, S.p.a. ("Stile"), a high-end wood flooring manufacturer located in Citta di Castello, Italy. (*Id.* ¶¶ 10-11).

In late 2013, Stile faced severe financial difficulties, leading Onofri to seek to sell the company. (*Id.*). Corey Lewis, a Stile customer, agreed to purchase the company's debts and assets with a business partner. (*Id.* ¶ 11). Lewis and his partner formed an Italian entity, Anbo-Stile ("Anbo"), to complete the purchase, which was accomplished pursuant to an agreement

dated April 18, 2014. (*Id.* ¶¶ 12-13 and Ex. 1). The agreement was drafted in both Italian and English. (*Id.* ¶ 13). According to the English version, the agreement gave Anbo the right to manage the business for four years in return for a rent payment of €250,000 per year, with a conditional right of purchase at the end of the term. (*Id.* Ex. 1 at 24-25).

Around the same time, Stile entered into bankruptcy protection in the Court of Perugia. (*Id.* ¶ 15). Stile was renamed Tiberina Legnami S.p.a. ("Tiberina"). (*Id.*). Two liquidators, Roberto Belli and Patrizio Caponeri, were placed in charge of winding up the business of Tiberina. (*Id.*).

For the first two years of Anbo's operation, the business was successful; its 2015 revenue was approximately 8.3 million euros, and in June 2016 Anbo had pending orders for the next ten months totaling 20 million euros. (*Id.* ¶¶ 16-17).

## 2. <u>Plaintiff's Relationship with Anbo</u>

World Depot Corporation is a Massachusetts corporation that distributes and sells cabinetry and flooring products. (*Id.* ¶ 18). It acquires products directly from manufacturers and earns a markup on sales made to customers. It operates showrooms at five locations, including Peabody and Boston. (*Id.*).

Beginning in August 2015, World Depot expanded its operational capacity and constructed exclusive Anbo showrooms to demonstrate its commitment to the company's products. (*Id.* ¶ 20). World Depot alleges that it expended significant resources in doing so. (*Id.* ¶ 23). Business between World Depot and Anbo expanded such that by December 2015, World Depot was Anbo's second or third largest account. (*Id.* ¶ 21).

According to the complaint, World Depot and Anbo "made an oral agreement" in late February or early March 2016 under which World Depot would become Anbo's "exclusive

factory representative agent for the North American market." (*Id.*). The agreement apparently was never reduced to writing. No specific details concerning the agreement are pleaded in the complaint; among other things, the complaint does not indicate the person with whom the agreement was reached, the date of the agreement, the length of the agreement, or how it could be terminated.

### 3. Initial Disputes between Anbo and Tiberina

When Anbo first took possession of the factory, it hired Onofri as its general sales manager. (*Id.* ¶ 26). According to the complaint, the inventory was in disarray. (*Id.* ¶ 31). Inventory was stored in pallets assigned unique barcodes; when employees removed the pallets, they scanned the barcode to indicate how much inventory was being used. (*Id.*). However, the warehouses containing the pallets mixed inventory belonging to both Anbo and Tiberina. (*Id.* ¶ 32). Because of various issues with Tiberina's pallets, the computer software generated an excess number of invoices payable by Anbo to Tiberina. (*Id.* ¶ 33). Tiberina later accused Anbo of owing more than one million euros for inventory and back rent. (*Id.* ¶¶ 33, 39).

According to the complaint, Onofri performed poorly as a manager; Lewis confronted him and warned him that his job was in jeopardy. (*Id.* ¶ 29). Onofri then "successfully strained the relationship between Lewis and his business partner." (*Id.* ¶¶ 30, 34). "Eventually, Onofri and Lewis's business partner developed a high level of trust with each other, and began to shut Lewis out." (*Id.* ¶ 34).

### 4. Takeover of the Company

According to a decision of the Italian court, attached as Exhibit 4 to the complaint, by September 2015 Anbo was in arrears on its payments to Tiberina. (*Id.* Ex. 4). By December 2015, the unpaid rent and other obligations exceeded €857,000. (*Id.*).

According to the complaint, Onofri began organizing a takeover of the factory in early 2016. On February 28, 2016, he met with key factory employees, including union representatives, to announce his intention to form a "cooperativa" (an Italian form of cooperative, in which an organization is owned by its employees) to retake the factory. (*Id.* ¶ 35). The following evening, Onofri gained the support of Federico Biagioli, who had union contacts. (*Id.* ¶ 36). Onofri subsequently gained the support of Belli and Caponeri, the Tiberina liquidators. (*Id.* ¶ 37).

Onofri then allegedly supplied false information to Anbo's officers concerning its rent and inventory obligations to Tiberina. (*Id.* ¶¶ 38-39). In addition, Onofri allegedly spread false information about Anbo's owners to company agents and customers, publicly declaring his intent to form a cooperativa to seize back control of the factory. (*Id.* ¶ 40). Onofri also allegedly encouraged Anbo suppliers to halt all deliveries of raw materials, arranged for employees to slow production, and used his union connections, including Biagioli, to facilitate a strike. (*Id.*).

According to the decision of the Italian court, on May 23, 2016, Tiberina exercised its right to terminate the agreement with Anbo, based, among other things, on Anbo's failure to pay rent. (*Id.* Ex. 4). According to that decision, the exercise of the right to terminate "would appear legitimate," and "should result in the obligation to immediately surrender the company, as per law and contract." (*Id.*).

Allegedly at Onofri's instigation, the factory workers went on strike in early June 2016. (*Id.* ¶ 43). The Tiberina liquidators locked out Anbo management on June 20 and blocked Anbo's access to its e-mails. (*Id.* ¶¶ 44, 52). Nearly all employees were fired except those loyal to Onofri. (*Id.* ¶¶ 44-45).

The cooperativa was formally established on June 24, 2016, as the Stile Societa

Cooperativa (the "Cooperativa"), with Onofri as President.  (*Id.* ¶¶ 41-42).  Shortly afterward, Tiberina entered into an agreement whereby the Cooperativa would gain ultimate ownership of the factory.  (*Id.* ¶ 47).  On July 5, 2016, the Cooperativa formed a contract with Tiberina to lease the factory for less than one-third of the fee paid by Anbo.  (*Id.* ¶ 54).

Tiberina granted the Cooperativa access to Anbo's order book and its work-in-process, allegedly worth millions of euros.  (*Id.* ¶¶ 53, 58).  Tiberina allegedly blocked Anbo from transporting its own inventory from the factory and refused to let it ship completed orders.  (*Id.* ¶¶ 55, 58).  According to the complaint, Anbo management was unable to regain access to the factory until July 29, 2016, when it realized that a significant portion of its inventory had disappeared.  (*Id.* ¶ 49).  Anbo also alleges that the Cooperativa or Tiberina accessed its online bank account eleven times between July 11 and August 25, 2016.  (*Id.* ¶ 61).

An Italian court granted Anbo an injunction on July 8, 2016, to prevent Tiberina from transferring control or ownership of the factory.  (*Id.* ¶ 86).  The injunction was upheld on October 11, 2016.  (*Id.* ¶ 88).  However, it appears that Tiberina failed to comply.  (*Id.* ¶ 86).

## 5.  <u>Impact on World Depot</u>

The complaint alleges that after the takeover, shipments to World Depot were delayed.  (*Id.* ¶ 62).  This allegedly caused World Depot to fail to meet its customers' demands, leading several to cancel orders worth millions of dollars.  (*Id.* ¶¶ 62-65).  Furthermore, the Cooperativa allegedly shipped products to World Depot's customers directly, cutting it out of the supply chain altogether.  (*Id.* ¶ 67).

The complaint specifically alleges that the Cooperativa requested that Allegheny Contract, a Massachusetts customer of World Depot and Anbo, pay money directly to the Cooperativa.  (*Id.* ¶¶ 72-73).  The request was sent by e-mail on July 12, 2016, and Allegheny

made three wire transfers totaling $6,391.67 to the Cooperativa between July 22, 2016, and July 27, 2016. (*Id.* ¶ 73). In another communication to Allegheny, Onofri stated that Anbo and World Depot could not meet Allegheny's demands for flooring product. (*Id.* ¶ 74). The complaint contends that Allegheny was expected to place orders worth more than $5 million from Anbo and World Depot, and that defendants continue to siphon off plaintiff's business. (*Id.* ¶ 77).

The complaint further alleges that after the Cooperativa's takeover of the factory, Onofri sent a letter to all customers of World Depot. (*Id.* ¶¶ 79-81 and Ex. 3). The letter stated as follows:

> We want to inform you that the Stile partnership with Anbo is over. The new company "Stile Società Cooperativa["] is now managing the all Stile plant (offices and production) and it is the only one allowed to use the Stile patented marks, so every customer who wants to purchase a "Stile" branded product must contact and place the orders to [the Cooperativa].
>
> . . .
>
> We are working hard in order to minimize the inconveniences that such a kind of shifting will cause to your "everyday" activities and we are setting up people and resources to keep running as regularly as possible the production providing you the best assistance you may need after two weeks of stand by caused by inventory procedures.
>
> We are proud to say that this new Company has been made to reinforce the 100% "made in Italy" production and to complete the relaunch process that started a couple of years ago. In the last months, we created new Collections of products and new marketing tools that will help you to improve the Stile presentation and promotion to your clients. We look forward to develop[ing] this new program with you asap.
>
> Thank you for your support and trust and we hope we can keep successfully working together [for] many years to come.

(*Id.* Ex. 3) (errors in original).

According to the complaint, '[u]pon information and belief, [that] letter was sent to all of

World Depot's customers." (*Id.* ¶ 81). It further alleges that "[a]t a minimum, the letter was sent to Allegheny (based in Massachusetts) and Rouse Company (based in California), a prospective customer of World Depot that was interested in purchasing Anbo products." (*Id.*).

### B.  Procedural Background

World Depot filed the complaint in this action in December 2016. The complaint alleges claims for violation of 18 U.S.C. § 1962(c) (RICO) (Count 1); violation of 18 U.S.C. § 1962(d) (RICO) (Count 2); tortious interference with contractual relations (Count 3); tortious interference with advantageous business relations (Count 4); tortious interference with prospective business relations (Count 5); and violation of Mass. Gen. Laws ch. 93A (Count 6). Defendants Onofri and the Cooperativa have moved to dismiss the claims against them under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. It appears that plaintiff has not completed service on the other defendants.

## II.  The Civil RICO Claims

Defendants contend that this Court lacks personal jurisdiction over them as to all counts. That question is somewhat complicated by the fact that the complaint asserts two claims under the civil RICO statute, 18 U.S.C. § 1964.

One section of the RICO statute, 18 U.S.C. § 1965, provides for nationwide service of process in civil cases under certain circumstances, in order "to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a single court in a trial." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986). Rule 4 of the Federal Rules of Civil Procedure, in turn, provides that service of process establishes personal jurisdiction over a defendant. Fed. R. Civ. P. 4(k)(1)(C), ("Serving a summons . . . establishes personal jurisdiction over a defendant when authorized by a federal statute."). Thus, under § 1965 and

Rule 4, personal jurisdiction over defendants can be obtained in RICO cases under circumstances where it otherwise might not exist.

Unfortunately, § 1965 is not a model of clarity. The first section, § 1965(a), provides that a RICO action may be brought against "any person" in any district "in which such person resides, is found, has an agent, or transacts his affairs." The second section, § 1965(b), provides that in any civil RICO action "in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned." The third section, § 1965(c), addresses service of subpoenas on witnesses in cases brought by the United States. And the fourth section, § 1965(d), provides that "[a]ll other process . . . may be served on any person in any judicial district in which such person resides . . . ."

There is a split in the circuits as to how the statute ought to be interpreted. The Second, Seventh, Ninth, and Tenth Circuits have held that § 1965(b) is the controlling provision for personal jurisdiction purposes—that is, the plaintiff must establish that the forum state has personal jurisdiction over at least one defendant, and that service of process (and therefore the conferring of personal jurisdiction) over other defendants may occur as "the ends of justice require." *See, e.g.*, *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998); *Lisak v. Mercantile Bancorp., Inc.*, 834 F.2d 668, 671 (7th Cir. 1987); *Butcher's Union*, 788 F.2d at 539; *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006). The Fourth and Eleventh Circuits have held that § 1965(d) is the controlling provision—that is, personal jurisdiction exists over all defendants if any one defendant has "minimum contacts with the United States—the relevant sovereign." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946 n. 21 (11th Cir. 1997); *see also ESAB Group, Inc. v.*

*Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997).[1] The First Circuit has not yet decided the issue, although a district court in this circuit has adopted the reasoning of the Fourth and Eleventh Circuits. *See Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 950 (D.R.I. 1990) (concluding that § 1965(d) rather than § 1965(b) "actually controls the outcome here").

It is doubtful whether the resolution of that issue either way would actually affect the jurisdictional question in this case. The contacts of the defendants with Massachusetts, as set forth below, are minimal. The only alleged contact with any state other than Massachusetts is the allegation that the letter was sent to the Rouse Company in California, a prospective (not actual) customer of World Depot. In any event, this Court will adopt the approach of the majority of circuits, and require plaintiff to establish personal jurisdiction in Massachusetts over at least one defendant, based on that defendant's contacts with the forum state.

A further point warrants discussion. Because of the broad jurisdictional reach of the RICO statute, the courts should be particularly vigilant not to permit a plaintiff to assert a spurious RICO claim in order to try to obtain personal jurisdiction over other defendants (or supplemental subject-matter jurisdiction over state-law claims). Here, although the case will be resolved on the jurisdictional issue, it is worth noting that the complaint appears to fail to state a claim under the RICO statute.

There are four basic elements to a civil RICO claim: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148, 163 (D. Mass. 2003) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

---

[1] Because RICO is a federal statute, the applicable due process clause is in the Fifth Amendment rather than the Fourteenth Amendment. *Republic of Panama*, 119 F.3d at 947. The Eleventh Circuit has stated that "[a] court must . . . examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state in conducting the Fifth Amendment analysis." *Id.* (citing *Securities and Exchange Comm'n v. Carrillo*, 115 F.3d 1540, 1543-44 (11th Cir. 1997)).

496 (1985)).  Defendants here contend that plaintiff has failed to plead (1) an enterprise separate

from defendants, (2) the requisite pattern of racketeering activities, (3) fraud with sufficient

particularity as required by Fed. R. Civ. P. 9(b), and (4) causation between the purported

racketeering conduct and injury.  At a minimum, the complaint fails to plead a pattern of

racketeering activities.

A "pattern of racketeering activity" requires, at a minimum, two related predicate acts

committed within ten years of one another.  18 U.S.C. § 1961(5).  *See also Schultz v. Rhode

Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731-32 (1st Cir. 1991).  The statute "defines

'racketeering activity' as violations of specified federal laws, such as the mail and wire fraud

statutes."  *Atl. Acquisitions, LLC v. J.H. Reid Gen. Contractor*, 909 F. Supp. 2d 32, 35 (D. Mass.

2012).  Such predicate acts must be related to one another and pose a threat of continued criminal

activity.  *Id.*  Here, it is undisputed that the purported predicate acts are related to one another.

However, defendants contend that the complaint fails to plead the required degree of

"continuity."

The "continuity" requirement may be satisfied through either a "closed-ended" or "open-

ended" approach.  *See Giuliano v. Fulton*, 399 F.3d 381, 387 (1st Cir. 2005) (citing *H.J. Inc. v.

Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).  "Under the closed-ended approach,

[p]laintiff must allege predicate acts 'extending over a substantial period of time that amount to a

threat of continued criminal activity.'"  *Atl. Acquisitions*, 909 F. Supp. 2d at 35 (citing *Giuliano*,

399 F.3d at 387).  Although "weeks or months" will not suffice, predicate acts extending "over

several years" can "compel a conclusion of closed-ended continuity."  *Id.*  In addition, where

predicate acts involve "one scheme with a singular objective and a closed group of target

victims," a finding of closed-ended continuity is unwarranted.  *Efron v. Embassy Suites (Puerto*

*Rico), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000).

Here, the alleged predicate acts occurred within a single day. (Compl. ¶¶ 71-85).[2] Furthermore, the only purported victim is World Depot. That clearly fails to satisfy the requirements of closed-ended continuity. *See Soto-Negron v. Taber Partners I*, 339 F.3d 35, 38-39 (1st Cir. 2003) (finding six predicate acts occurring within five days of each other insufficient); *North Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001) (finding two predicate acts occurring within four months of each other insufficient).

By contrast, under the open-ended approach, a plaintiff must allege that the "racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *Atl. Acquisitions*, 909 F. Supp. 2d at 36 (quoting *Giuliano*, 399 F.3d at 387). However, plaintiff here has not shown that the July 12, 2016 e-mail and letter "foreshadowed similar acts occurring repeatedly into the future," as required for open-ended continuity. *North Bridge Assocs.*, 274 F.3d at 43. The complaint infers that because World Depot has not received payments from Allegheny, the Cooperativa has usurped business from other Anbo customers. (Compl. ¶¶ 75, 77, 83). Although plaintiff allegedly continues to suffer the consequences of defendants' July 12 communications, those communications alone do not create a plausible inference that there is "a threat of continuing racketeering activity." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 47 (1st Cir. 1991). "There is nothing to suggest that the defendants would seek to . . . employ mail and wire fraud indefinitely." *Efron*, 223 F.3d at 19. Nor does the complaint establish that the

---

[2] The first alleged predicate act is wire fraud. The complaint alleges that the Cooperativa sent out an e-mail on July 12, 2016, to Allegheny directing that all payments be made to the Cooperativa's bank account. The second alleged predicate act is mail fraud. The complaint alleges that the Cooperativa mailed a letter on July 12, 2016, to World Depot customers directing them to place "Stile" branded orders with the Cooperativa.

alleged wire and mail fraud were part of the Cooperativa's "regular way of doing business."[3]

The complaint therefore fails to establish the continuity necessary for RICO. *See id.*

## III.  Personal Jurisdiction

With that as a predicate, the Court will turn to the issue of personal jurisdiction.

### A.  Legal Standard

The plaintiff bears the burden of establishing that the court has personal jurisdiction over

the defendants. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50

(1st Cir. 2002).  In considering a motion to dismiss under Rule 12(b)(2), the court may employ

several standards to assess whether plaintiff has carried that burden:  the "*prima facie*" standard;

the "preponderance-of-the-evidence" standard; or the "likelihood" standard. *See id.* at 50 n.5;

*Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145-46 (1st Cir. 1995).  Where,

as here, the court is called to make that assessment without first holding an evidentiary hearing,

the *prima facie* standard is applied. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618

(1st Cir. 2001).  Under that standard, the court takes the plaintiff's "properly documented

evidentiary proffers as true and construe[s] them in the light most favorable to [plaintiff's]

jurisdictional claim." *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016) (citing

*Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008)).  A plaintiff may not "rely on

unsupported allegations in [its] pleadings." *A Corp.*, 812 F.3d at 54 (quoting *Platten v. HG

Bermuda Exempted Ltd.,* 437 F.3d 118, 134 (1st Cir. 2006)).  "Rather, [the plaintiff] must put

forward 'evidence of specific facts' to demonstrate that jurisdiction exists." *Id.* at 58 (quoting

*Foster-Miller*, 46 F.3d at 145).  Facts offered by the defendant "become part of the mix only to

---

[3] It appears that the letter and e-mail were one-time communications sent to customers encouraging them to do business with the Cooperativa.  Therefore, it is likely that the alleged scheme had a natural ending point:  the termination of those customers' ties to World Depot. *See Efron*, 223 F.3d at 20; *see also Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 782-83 (7th Cir. 1994).

the extent that they are uncontradicted." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *Adelson v. Hananel,* 510 F.3d 43, 48 (1st Cir. 2007)).

To establish personal jurisdiction, plaintiff here must show that the requirements of the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, are satisfied, and that the exercise of jurisdiction is consistent with constitutional due process. *Daynard,* 290 F.3d at 52; *Intech, Inc. v. Triple "C" Marine Salvage, Inc.,* 444 Mass. 122, 125 (2005). Due process requires that a plaintiff alleging specific personal jurisdiction establish the existence of three conditions:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must be reasonable.

*Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016) (quoting *Phillips*, 530 F.3d at 27 (alterations omitted)).

**B.** **Analysis**

"The jurisdictional requirements imposed by the Massachusetts long-arm statute are quite similar to, though not completely congruent with, the jurisdictional requirements imposed by the Due Process Clause." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). Because the "modest differences" between the two are immaterial here, this analysis will begin directly with the constitutional test. *Id.*

The Supreme Court has defined two categories of personal jurisdiction: general and specific. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). As applied to corporations,

general jurisdiction reaches "causes of action arising from dealings entirely distinct from" a foreign corporation's in-state contacts. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945).

Specific jurisdiction is limited to claims that "aris[e] out of or [are] related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). Over the years, the Supreme Court "has increasingly trained on the 'relationship among the defendant, the forum, and the litigation,' i.e. specific jurisdiction, [and] general jurisdiction has come to occupy a less dominant place in the contemporary scheme." *Daimler*, 134 S. Ct. at 758 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

### 1. General Jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop*, 564 U.S. at 919. To be "at home" in a foreign state, a corporation must have affiliations with that state so substantial that it is "comparable to a domestic enterprise in that State." *Daimler*, 134 S. Ct. at 758 n.11. The Supreme Court has indicated that such jurisdiction will exist only in the "exceptional case." *See id.* at 761 n.19.

It is clear that a Massachusetts court may not assert general jurisdiction over either Onofri or the Cooperativa. Onofri is an Italian resident and the Cooperativa is an Italian business. (Compl. ¶¶ 2-3).[4] Nor do any circumstances exist warranting a finding that an "exceptional case" exists for finding general jurisdiction over the Cooperativa. Simply soliciting business from a Massachusetts customer, without more, is not sufficient. *Cf. Perkins v. Benguet Consol.*

---

[4] The Cooperativa is not a corporation; rather, it is an organization comprised of and owned by company employees. (Compl. ¶ 35).

*Min. Co.*, 342 U.S. 437 (1952).  Accordingly, there are no grounds for general jurisdiction.

### 2.    Specific Jurisdiction

"Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities."  *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).  That nexus requires three things:  (1) "the plaintiff's claim must be related to the defendant's contacts" with the state; (2) "the defendant's contacts with the state must be purposeful"; and (3) "the exercise of jurisdiction must be reasonable under the circumstances."  *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005).  All three requirements must be met, but a strong showing on reasonableness can fortify a more marginal showing of relatedness and purposefulness.  *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 717 (1st Cir. 1996).

### a.    Relatedness

"Questions of specific jurisdiction are always tied to the particular claims asserted."  *Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999) (citing *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992) ("[T]he defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case.")).  The requirement of relatedness "ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with the forum that is wholly unrelated to the suit at issue."  *Swiss Am. Bank*, 274 F.3d at 623.

The inquiry thus focuses on the defendant's in-forum contacts that "caused the injury or gave rise to the cause of action."  *Id.* at 622.  Here, in substance, the complaint alleges that World

Depot was harmed by defendants' wrongful actions in Italy that culminated in Anbo's loss of control of the Citta di Castello factory, and by defendant's subsequent conduct of the business. (Compl. ¶¶ 108-124). The harm is alleged to have occurred in two ways.

First, the complaint alleges that the Cooperativa's takeover "made it impossible for Anbo to transport its own inventory" and transact any business. (*Id.* ¶ 58). "Because of delays caused by the takeover of the [factory], World Depot was unable to meet the demands of various customers." (*Id.* ¶ 62). The complaint suggests that these delays, rather than the letter allegedly sent to customers like Allegheny, were the primary cause of lost orders, goodwill, and future business that plaintiff contends was worth millions of dollars. (*Id.* ¶¶ 63-66). To that extent, plaintiff may have been an indirect victim of defendants' alleged transgressions, but none of the relevant actions of defendants occurred in Massachusetts.

Second, the complaint alleges that defendants tortiously interfered with contractual relationships (or business relationships) between World Depot and its actual (or prospective) customers in the United States. (*Id.* ¶¶ 108-120). Unlike the claim based on delays in shipments, these claims have at least some direct relation to the United States: the Cooperativa is alleged to have communicated directly with those customers, at least one of which was in Massachusetts.

Nonetheless, defendants' conduct in Massachusetts has only a slight connection to the tortious interference claims. Virtually the entirety of defendants' conduct occurred in Italy; whether that conduct was unlawful is likely a question of Italian law. Indeed, if it was not unlawful under Italian law, the Cooperativa had the right to transmit the two July 12 communications to its own customers. To the extent defendants' conduct was wrongful, it was directed principally against Anbo, another Italian entity that (for all practical purposes) was merely a different iteration of the same business enterprise as the Cooperativa. And the

complaint does not allege either that the Cooperativa had a contract with plaintiff or that it was the successor-in-interest to Anbo such that it would be bound to honor the purported oral contract Anbo had with plaintiff. Accordingly, plaintiff's intentional interference claims are only marginally related to defendants' in-state conduct.

### b.     Purposeful Availment

Personal jurisdiction is only proper when a defendant "purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on th[o]se contacts." *Swiss Am. Bank*, 274 F.3d at 624. Where, as here, the claim asserted does not arise out of the defendant's physical presence in the forum state, the First Circuit "look[s] for some other indication that the defendant reached into the forum, such as mail or telephone contacts." *Id.* at 622.

Plaintiff contends that defendants purposefully directed their activities toward Massachusetts by soliciting business directly from Allegheny and other unidentified Anbo clients. (Compl. Ex. 3). There are no other alleged contacts between defendants and Massachusetts. However, soliciting business in Massachusetts, as well as voluntarily corresponding with Massachusetts residents, can be sufficient to satisfy the purposeful availment prong. *See Tatro v. Manor Care*, 416 Mass. 763, 767-68 (1994). Therefore, plaintiff's contentions that defendants "directed all [of Allegheny's] payments to be wired to the Cooperativa" and solicited business from Allegheny are sufficient to find that defendants intentionally reached into the state, making jurisdiction in Massachusetts at least somewhat foreseeable. (Compl. ¶¶ 72, 79, 81-82).

### c.     Reasonableness

The exercise of personal jurisdiction must be reasonable and fundamentally fair. *See*

*Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994). To determine reasonableness, the First Circuit considers what it calls "the gestalt factors": (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Nowak*, 94 F.3d at 717. These factors are "not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice." *Ticketmaster-N.Y v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994).

The first factor, defendants' burden of appearing, is relevant because plaintiff's chosen forum is "onerous in a special, unusual, or other constitutionally significant way." *Pritzker*, 42 F.3d at 64. Defendants Onofri and the Cooperativa are an Italian citizen and an Italian entity, respectively, essentially accused of violating Italian law. Both defendants would have to defend an action in a foreign country. Almost all discovery would occur in Italy. Thus, this factor weighs against a finding of reasonableness.

The second factor is the forum state's interest in adjudicating the dispute. Massachusetts has some interest in adjudicating this dispute because it has an interest in protecting its citizens from wrongful conduct. But that interest is relatively modest where the relevant conduct occurred almost entirely in Italy, not Massachusetts.

The third factor favors a finding of reasonableness. Deference is owed to a plaintiff's choice of forum, and World Depot has elected to file suit in its home state. *Id*.

The fourth factor, the interests of the judicial system, cuts against a finding of reasonableness. Courts are instructed to focus on the judiciary's "interest in obtaining the most effective resolution of the controversy." *Id.* at 63. Nothing at all suggests that judicial economy

would be best served by litigating this dispute in Massachusetts. Because defendants' allegedly wrongful conduct occurred in Italy, Italian law would likely apply. This Court has no training or facility in Italian law. Presumably, virtually all of the witnesses reside in Italy and speak Italian, and the relevant documents are mostly in Italian. Interpreters and transportation of witnesses would be necessary if the matter were to be litigated here. Nor does it appear that the Italian courts are ill-equipped to provide a remedy for plaintiff's claims. Litigation brought by Anbo in the Court of Perugia already resulted in an injunction against the Cooperativa and Tiberina for their actions underlying this complaint. (Compl. Ex. 4 at 13-14).

Finally, the fifth factor, the common interests of all sovereigns in promoting substantive social policies, is inconclusive. Massachusetts has a policy protecting its citizens from tortious conduct. However, Italy also has an interest in regulating the conduct of its domiciles, regulating intra-corporate disputes, and protecting its citizens from undue liability.

Considered as a whole, the exercise of personal jurisdiction over defendants is not reasonable. Again, this is essentially a dispute about the takeover of an Italian business. Whether that action was wrongful will turn on the probable application of Italian law to events that occurred almost entirely in Italy. The contacts of defendants with Massachusetts are related to the claims asserted, but only marginally so.

Under the circumstances, there are not minimum contacts with the state such that the exercise of jurisdiction accords with "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316. The Court therefore lacks personal jurisdiction over defendants for the purpose of adjudicating plaintiff's purported RICO and state-law claims.

**IV.** **Conclusion**

For the foregoing reasons, the motion to dismiss of defendants Onofri and Stile Societa

Cooperativa is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV

Dated:  December 4, 2017        United States District Judge